# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| REAL TIME PHARMACY SERVICES, INC. D/B/A MEDENVIOS HEALTHCARE, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:17CV1096 HEA |
| EXPRESS SCRIPTS, INC., | ) ) | |
| Defendant. | ) ) | |

## **OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order, [Doc. No. 9]. On March 30, 2017, the Court held a telephone hearing on this matter, at which both parties were represented by counsel. Arguments were presented at that time. For the reasons set forth below, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is denied.

### **Facts and Background**

Plaintiff is a pharmacy in Miami, Florida. Plaintiff and Defendant entered into a contract which consisted of a *Pharmacy Provider Agreement* ("*Agreement*") and a Network Provider Manual.

On November 3, 2016, Defendant initiated an investigation of Plaintiff. The purpose of the investigation was to validate that Plaintiff purchased diabetic testing supplies for which it had billed Defendant. Defendant requested extensive

amounts of information from Plaintiff from July 1, 2016 until October 31, 2016. The request was to confirm that Plaintiff purchased sufficient quantities of the diabetic testing strips for which it had billed Defendant.

Plaintiff contacted its supplier in an effort to comply with Defendant's request. Plaintiff requested the supplier, Masters Pharmaceutical to provide Defendant with information necessary to validate its purchases.

On November 18, 2016, Defendant sent an additional letter to Plaintiff. It confirmed that Plaintiff and Masters had responded to its request. The letter stated that it needed additional information. Defendant requested lot numbers and proof of product origination for invoices submitted by Masters on behalf of Plaintiff in cooperation with Defendant's request for three brands of diabetic testing strips. Defendant claimed Plaintiff had obtained these strips from an "unauthorized" distributor of the products.

Masters notified Plaintiff and Defendant that it did not maintain the lot numbers and proof of product origination because it was not legally required to do so. Until the recent investigation, Defendant had never requested the lot number or proof of origination from Plaintiff or Masters.

On December 5, 2016, Plaintiff contacted Defendant and included a November 23, 2016 letter from Masters wherein Masters states that it only purchased test strips from fully qualified vendors, each of which had signed a

2

Continuing Supplier Warranty providing that the products Masters purchases are authentic, lawfully sourced and in full compliance with the law. This letter also made clear that Plaintiff had conducted substantial due diligence to verify the legitimacy of Masters and the diabetic testing supplies it purchased from Masters. Plaintiff also noted that moving forward, it would secure the lot number and proof of product origination for all products.

ON January 12, 2017 Defendant sent another letter to Plaintiff and stated that Defendant identified discrepancies totaling $160,414.14. On January 26, 2017, Plaintiff again asserted its position that Defendant's claim of purchase discrepancies and recoupment was incorrect and improper where Plaintiff was able to prove it purchased its products from legitimate wholesalers.

On March 16, 2017, Defendant notified Plaintiff that it was terminating its relationship with Plaintiff and that Plaintiff would no longer be considered a provider or participating pharmacy in any of Defendant's networks. Plaintiff claims this decision would effectively destroy its business.

The Provider Manual sets forth specific policies and procedures that Plaintiff was required to follow when submitting claims to Defendant for reimbursement. When submitting claims for diabetic supplies, including testing strips, the Provider Manual expressly required Real Time (1) to ensure that the diabetic supplies were

purchased from authorized manufacturers, and (2) to maintain pedigree or proof of origin documentation for the products:

> [Plaintiff] will validate the authenticity of all products purchased and fully vet their wholesalers and suppliers. [Plaintiff] will be required upon request to furnish pedigree or proof of origin of products regardless of whether the products submitted are prescription drugs or DME products, including but not limited to diabetic supplies, testing strips, lancets and glucometers. In the case of DME products, [Plaintiff] is responsible for ensuring products are purchased from suppliers that are authorized by the manufacturer to distribute these products.

Plaintiff's obligation to maintain records on the origins of diabetic testing products is repeated in the Provider Manual's recordkeeping requirements:

> [Plaintiff] agrees to provide [Defendant] with any and all information and documents requested relating to a Covered Service, including but not limited to:
> …
> Wholesaler and supplier invoices, proof of invoice payment, and pedigrees. When the wholesaler or supplier is not recognized by the manufacturer as an authorized wholesaler or supplier of DME products, including but not limited to diabetic supplies, testing strips, lancets, and glucometers, the supplier's invoices will be rejected. . . .

Plaintiff seeks a temporary restraining order that prohibits Defendant from terminating the parties' contractual relationship.

## Discussion

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant, (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant, (3) the probability that movant will succeed on the merits, and (4)

4

the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The same factors govern a request for a temporary restraining order. *Roberts v. Davis*, 2011 WL 6217937, at *1 (E.D. Mo. Dec. 14, 2011). "No one factor is dispositive of a request for injunction; the Court considers all the factors and decides whether 'on balance, they weigh towards granting the injunction.'" *Braun v. Earls*, 2012 WL 4058073, at *1 (E.D. Mo. Sept. 14, 2012) (quoting *Baker Elec. Co-Op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994)).

"Although "no single factor is determinative," *Dataphase,* 640 F.2d at 113, the probability-of-success factor is the most significant, *see Home Instead, Inc. v. Florance,* 721 F.3d 494, 497 (8th Cir.2013)." *Sharpe Holdings, Inc. v. U.S. Dept. of Health and Human Services* 2015 WL 5449491, 4 (8th Cir. September 17, 2015) In seeking a mandatory injunction that disrupts the status quo, the Plaintiffs "must demonstrate not only that the four requirements for a preliminary injunction are met but also that they weigh heavily and compellingly in their favor." *Blankenship v. Chamberlain*, 2008 WL 4862717, at *2 (E.D. Mo. Nov. 7, 2008) (quoting *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001)).

***Irreparable Harm***

Plaintiff alleges irreparable harm in that if Defendant terminates their contract, it will not be able to remain in business. Also, Plaintiff argues that its customers will be adversely affected and will not be able to obtain their needed

diabetic strips. Plaintiff has not established the existence of irreparable harm in a number of respects.

Initially, Plaintiff has not presented sufficient evidence of damages. Instead, Plaintiff has merely presented evidence that if it does not receive payment, it will suffer economic harm. At no point has Plaintiff presented any concrete evidence of harm warranting injunctive relief. Where "[t]he possible harm identified is wholly speculative . . . it cannot be called irreparable harm." *Local Union No. 884 v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995).

More significantly, Plaintiff's alleged harm is not irreparable, as there are other causes of action under which money damages are a potential form of relief. *Alternative Med. & Pharmacy, Inc. v. Express Scripts, Inc.*, 2014 WL 4988199, at *7 (E.D. Mo. Oct. 7, 2014) ("[T]he harm is purely economic and therefore not irreparable.").

In the irreparable harm analysis, only harm to the plaintiffs is considered. Plaintiff's customers are not parties before the Court, so any harm to them is not considered within this factor. Regardless, there is no evidence before the Court that any customer has suffered harm, or will suffer harm. None of Plaintiff's customers have provided the Court with an affidavit attesting to their inability to obtain their diabetic strips from another pharmacy.

***Likelihood of Success***

Plaintiff agreed in its contract as follows:

> [Plaintiff] will validate the authenticity of all products purchased and fully vet their wholesalers and suppliers. [Plaintiff] will be required upon request to furnish pedigree or proof of origin of products regardless of whether the products submitted are prescription drugs or DME products, including but not limited to diabetic supplies, testing strips, lancets and glucometers. In the case of DME products, [Plaintiff] is responsible for ensuring products are purchased from suppliers that are authorized by the manufacturer to distribute these products.

Plaintiff's obligation to maintain records on the origins of diabetic testing products is repeated in the Provider Manual's recordkeeping requirements:

> [Plaintiff] agrees to provide [Defendant] with any and all information and documents requested relating to a Covered Service, including but not limited to:
> …
> Wholesaler and supplier invoices, proof of invoice payment, and pedigrees. When the wholesaler or supplier is not recognized by the manufacturer as an authorized wholesaler or supplier of DME products, including but not limited to diabetic supplies, testing strips, lancets, and glucometers, the supplier's invoices will be rejected. . . .

It appears to the Court that the actions taken by Defendant were in accordance with the parties' contract and the Manual that was incorporated into the contract. The Court also finds that the Plaintiff is unlikely to succeed on the merits of the claims, which weighs against the award of injunctive relief. Moreover, Plaintiff was aware that the action taken was a possibility under the terms of the Agreement. Therefore, the Court concludes that Plaintiff, without more of a showing, is unlikely to succeed on its action for declaratory and injunctive relief

*Public Interest*

The public interest favors compliance with the parties' agreement particularly in considering the serious nature of the investigation into the proper manufacturers and safe diabetic strips.

*Balance of Harms*

Plaintiff agreed to certain obligations when it entered into the agreement with Defendant. Through enforcement of contractual obligations, the public interest is served.

## Conclusion

The Court has considered the entire record and the arguments presented at the hearing on this matter. Based upon the foregoing consideration of all of the *Dataphase* factors, Plaintiff's demand for mandatory relief and failure to establish irreparable harm, Plaintiff is not entitled to a temporary restraining order

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order, [Doc. No. 9], is **DENIED**.

Dated this 30th day of March, 2017.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE